1

1     IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2              FORT WORTH DIVISION

3    UNITED STATES OF AMERICA      .  CRIMINAL ACTION NO.
                                   .  4:05-CR-040-Y
4    V.                            .
                                   .  Fort Worth, Texas
5    DOUGLAS SOVEREIGN SMITH, JR.  .  March 11, 2014
     . . . . . . . . . . . . . . . .

6

7

8

9                TRANSCRIPT OF PROCEEDINGS
                    (Revocation Hearing)
              BEFORE THE HONORABLE TERRY R. MEANS
10               UNITED STATES DISTRICT JUDGE

11

12

13

     APPEARANCES:
14
     For the Government:          MS. NANCY LARSON
15                                United States Attorney's Office
                                  801 Cherry Street, Suite 1700
16                                Fort Worth, Texas  76102-6897
                                  (817) 252-5200
17
     For the Defendant:           MR. JEFF A. KEARNEY
18                                Kearney Wynn
                                  3100 West 7th Street
19                                Suite 420
                                  Fort Worth, Texas  76107
20                                (817) 336-5600

21   Court Reporter:              MS. ANA P. WARREN
                                  U.S. District Court Reporter
22                                501 W. 10th Street, Room 502
                                  Fort Worth, Texas  76102-3637
23                                (817) 850-6681

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

2

*P R O C E E D I N G S*

1

2     (Commencing, 11:30 a.m.)

3         THE COURT:  Once again, this is Case Number

4     4:05-CR-040-Y, United States of America versus Douglas

5     Sovereign Smith, on a petition for offender under

6     supervision.

7     Mr. Smith, will you please step to the lectern along with

8     your counsel?

9     In the petition for offender -- first of all, will you

10    please acknowledge your presence in court for the record by

11    stating your full name?

12        DEFENDANT SMITH:  My name is Douglas Sovereign Smith,

13    Jr.

14        THE COURT:  Mr. Smith, it is alleged in a petition

15    for offender under supervision that you have violated certain

16    conditions of your supervised release.  As for the first

17    allegation under Roman Numeral Paragraph or Section I, I find

18    that the nature of noncompliance doesn't fit with the

19    violation of the additional condition.  So I strike that, and

20    we'll proceed to Number 2.

21    The nature of compliance -- noncompliance there is that on

22    May 14, 2013, you reported to the probation office for an

23    office visit with a thumb drive in your possession and

24    reported it contained a manuscript you wrote while you were in

25    prison.  That would be a violation of the additional condition

3

1    prohibiting you from possessing portable storage devices such

2    as thumb drives.

3        And the Roman Numeral III, it is alleged that on

4    November 9, 2013, Senior U.S. Probation Officer Linda Warner

5    witnessed you accessing the internet without the permission of

6    the probation office, and that would be a violation of the

7    additional condition that you not possess or access a

8    computer.

9        How do you plead to each of these allegations against you,

10   sir, true or not true?

11            DEFENDANT SMITH:  To allegation 2, it is true.  To

12   allegation 3, it is not true.

13            THE COURT:  Okay.  Does the government have anything

14   to present to the Court in support of the defendant's plea of

15   true as to 2 and in opposition to his not true plea as to 3?

16            MR. KEARNEY:  Your Honor, before she answers that,

17   may I add something?

18            THE COURT:  Yes, sir.

19            MR. KEARNEY:  The issue on true as to Roman Numeral

20   II is he did have the flash drive, but he had it for the

21   purpose of bringing it to the probation office to ask her

22   about something, what he can do with it.  So I don't think --

23   true, he did possess it, but the reason he possessed it I

24   think the evidence will show is that he possessed it for the

25   purpose of bringing it to the probation officer to ask her how

4

1    to access it under the rules.

2      So that's -- you know, we don't want to belabor this

3    point, but he did, true, possess it, but the reason he

4    possessed it I think is important.

5          THE COURT:  I agree.  Let me, perhaps, shorten this

6    proceeding.

7      I'll just tell you, Ms. Larson, based on what I have

8    before me, I'm disinclined to revoke.  Now, if you believe

9    strongly that I need to, I'll hear whatever you have, but what

10    we have here are somewhat technical violations -- they're

11    violations, but they are technical violations, and I think

12    that, based on what I have before me now, that the proper

13    disposition is to decline to revoke and to allow the

14    supervised release to continue making clear in the record, as

15    I would do, that the allegations in Sections 2 and 3 of the

16    petition remain unadjudicated and may be counted against

17    Mr. Smith in any subsequent hearing.

18      Now, if you believe that these are more than technical

19    violations and should result in revocation, you certainly are

20    free to prove that.

21          MS. LARSON:  Well, Your Honor, the government

22    believes after speaking with the probation officer who is

23    supervising him as well as his therapist, that this is really

24    part of a larger problem, because as we see it, the nature of

25    Mr. Smith's crime and some of the things that he's admitted to

1    in his presentence report and in his therapy, they are

2    boundary violations, and what we have here is repeated

3    boundary violations.

4        This petition was not filed in a vacuum.  He was told

5    repeatedly.  He was given graduated sanctions, but he

6    continues to push the envelope and always asks for forgiveness

7    rather than permission, and he has been admonished

8    repeatedly.

9        So based on that -- I don't want the Court to think I'm

10   being unreasonable, but based on that, I think the Court

11   should hear from the probation officer and the therapist.

12            THE COURT:  All right.  We'll hear from the

13   government, and then we'll allow the defendant to present his

14   viewpoint once they are done.  You may be seated.

15       Call your first witness.

16            MS. LARSON:  The government calls Linda Warner.

17            THE COURT:  Good morning.  Please raise your right

18   hand and be sworn.

19       (Witness sworn by the Court)

20            THE COURT:  Please be seated.

21   I don't know why we have got that big pot up there.  I

22   guess we thought you might need it to stay awake.  I don't

23   know.

24            LINDA WARNER, testified under oath as follows:

25                        **DIRECT EXAMINATION**

6

1    BY MS. LARSON:

2    Q.  Good morning.  Would you please state your name?

3    A.  Linda Warner.

4    Q.  How are you employed?

5    A.  I'm a United States Probation Officer in the Eastern

6    District of Texas.

7    Q.  How long have you been so employed?

8    A.  I've been employed with the Eastern District of Texas for

9    about 13-and-a-half years.  Prior to that, I was a probation

10   officer in Dallas County for 11 years.

11   Q.  Do you supervise Mr. Douglas Smith?

12   A.  Yes, I do.

13   Q.  And do you see him in the courtroom today?

14   A.  Yes, I do.

15   Q.  Is he seated next to his counsel at the -- to my left?

16   A.  Correct, yes.

17   Q.  Now, I would like to direct your attention to the second

18   violation, which is dated May 14.  Can you explain to the

19   Court the circumstances of that violation?

20   A.  Mr. Smith came into the probation office and handed me a

21   thumb drive, and I advised him that he was in violation of his

22   conditions of supervision by possessing that.

23   Q.  Now, had he known that prior to seeing you?

24   A.  Yes.  He was aware of the condition.  It was read to him.

25   He was given a copy of them.  Previous reports -- every report

1   he is -- I'm sorry.  Every office visit when he reports to me,

2   he is asked if he has possessed a thumb drive.  So he is fully

3   aware he's prohibited from possessing that.

4   Q.  Did he tell you how he came to possess it?

5   A.  Yes.  He said that when he was in the Bureau of Prisons,

6   he wrote a manuscript -- I'm sorry.  It's an autobiography.

7   I'm not sure exactly.  He e-mailed it to a friend in Michigan.

8   The friend in Michigan sent it to someone he knows in his sex

9   addict group in Denton, and that person put it on a thumb

10  drive and gave it to him to be edited.

11  Q.  Now, after he turned the thumb drive over to you, what did

12  you do other than admonish him that he was not suppose to have

13  it?

14  A.  I still have possession of the thumb drive.  I requested

15  that -- well, I requested from the U.S. Attorney's Office in

16  the Eastern District of Texas if they would -- well, first, I

17  asked if Lyles would look at the thumb drive, and he said, no,

18  he didn't have a -- I'm sorry.

19  Q.  Who is Lyles?

20  A.  Lyles Arnold.  I'm sorry, his treatment therapist.  When I

21  received the thumb drive, I asked my supervisor if I could put

22  it into my computer and look at it to see what was on it.  She

23  said, no, we don't have a forensic computer.  So then I asked

24  his treatment therapist, Lyles Arnold, if he had a computer

25  where he could put the thumb drive in it to look to see what

1    was on it.  He said, no, he did not.

2         So I contacted the U.S. Attorney's Office in the Eastern

3    District of Texas to ask them if they had a forensic computer.

4    She said -- oh --

5    Q.  Okay.  This is probably a little bit too much detail.

6    A.  Right.  I'm sorry.

7    Q.  Why don't we just move on.

8    A.  Needless to say, I haven't looked at it.  Last week I had

9    the first opportunity to see what was on it.

10             THE COURT:  And?

11             THE WITNESS:  And what is on it is somewhat of an

12   autobiography.  It also discusses his therapy, his opinion

13   regarding his addiction.

14             THE COURT:  No pornography?

15             THE WITNESS:  No pornography.  It discusses a little

16   bit about his instant offense and possession of the

17   pornography but no new pornography.

18   BY MS. LARSON:

19   Q.  Did you do anything in terms of graduated sanctions with

20   him with respect to the thumb drive?

21   A.  Correct.  He was admonished for possessing the thumb drive

22   and instructed that in the future he needs to use the tools

23   that he has learned in treatment, not to accept a thumb drive

24   if somebody presents it to him.

25   Q.  Now, I would like to direct your attention to the internet

9

1   violation.  Can you explain when that happened and the

2   circumstances surrounding it?

3   A.  I was during an unannounced home visit and approached his

4   house.  He has a window right next to the door where his

5   office is right there, and through the window, I could see him

6   at his desk on a computer.  When he came to the door, I asked

7   him what he was doing.  He explained to me that he was

8   listening to a financial radio show via the internet.  So I

9   asked him to go into the office so I could see what he was

10   doing.  He had his computer set up in one direction and

11   another computer open in the opposite direction, and the

12   internet was pulled up.  I could see a news web page pulled

13   up.

14   Q.  And when you say it was in the opposite direction, the one

15   that was actually accessing the internet was faced away from

16   him?

17   A.  Correct.

18   Q.  Did you encounter his wife at some point?

19   A.  Yes, I did.  She acknowledged that she opened the internet

20   for him and that he was listening to a financial program on

21   the internet.  She also made a comment that, you caught us,

22   and she pretty much tried to take the blame for him violating

23   his conditions and accessing the internet.

24   Q.  Now, how is it that his wife understands that that is a

25   violation?

1    A.  She has gone through the chaperone program at the

2    treatment provider, and she is aware that he is not allowed to

3    have access to the internet.  We've also discussed it during

4    pre-release.  We discussed her having the password protect on

5    her computer that he does not know.  So she's fully aware that

6    he is prohibited from accessing the internet.

7    Q.  Now, in relation to these two -- well, and then did you

8    decide to file a petition?

9    A.  Yes.  I decided to file a petition after that.  He had the

10   failed polygraph in between these two violations.  After the

11   failed polygraph, we did graduated sanctions after that.  We

12   prohibited him from traveling, prohibited him from having

13   contact with children under the age of 18 with or without a

14   chaperone, which included his grandchildren.  So it was

15   another graduated sanction, and then he continued to violate

16   by accessing the internet.

17   Q.  Now, directing your attention to October of 2013, did

18   something happen then that also concerned you?

19   A.  Yes.  It was reported --

20          MR. KEARNEY:  Your Honor, we're going to object

21   to anything outside of this petition.  We're not prepared to

22   defend against anything that's not in relation to -- not

23   reported in some manner not the basis of this.  I'm going to

24   object to it.

25          THE COURT:  I'll allow it.  Overruled.

1    A.  He reported to his treatment provider that him and his

2    wife went to the Lion King in Fair Park during the state fair,

3    which would have been something he should not have done.  He

4    should have received permission prior because there were a lot

5    of children there to see the Lion King.  So it was an

6    inappropriate place for him to be, which he is fully aware of.

7    It's discussed in his treatment therapy group as well as with

8    me.

9    BY MS. LARSON:

10   Q.  And, also, his wife would be aware of that?

11   A.  Yes.  She went through a chaperone program.  So she is

12   aware of that as well.

13            THE COURT:  Just as an aside, had he said, we want to

14   go see Lion King.  My wife would be with me.  Would you likely

15   have granted him permission?

16            THE WITNESS:  He would have done a safety plan with

17   his treatment provider, and it would probably have been

18   denied.

19            MS. LARSON:  That's all I have for this particular

20   witness, Your Honor.

21            THE COURT:  Cross examination?

22            MR. KEARNEY:  Yes, Your Honor.

23            THE COURT:  Go ahead, sir.

24                        **CROSS EXAMINATION**

25   BY MR. KEARNEY:

12

1    Q.  As to this Lion King issue, you know that he did disclose

2    it and discuss it with his group and Lyles Arnold?

3    A.  Yes.

4    Q.  Ahead of time?

5    A.  No, I was not aware he discussed it ahead of time.

6    Q.  As to the thumb drive, he walked in and he handed you the

7    thumb drive.  Is that right?

8    A.  Correct.

9    Q.  And he said, I just got this, and I want to in some way

10   get the book I wrote, the manuscript of the book I wrote, in

11   the penitentiary off of this, and can you tell me how I can do

12   that under the rules?  That's what he asked you to do.  Is

13   that correct?

14   A.  I don't recall.  I think once I saw the thumb drive, I

15   just said, you're in violation of your conditions of

16   supervision, and confiscated the thumb drive because it is

17   considered contraband, but I don't --

18   Q.  Let me ask you to answer my question.  Did he tell you

19   that he wanted to get your permission and advice on how to get

20   the manuscript off the thumb drive so he could put it on his

21   word processor and edit it?  Wasn't that the point of the

22   exercise of bringing the thumb drive?

23   A.  I don't recall that.

24   Q.  Well, after you took it and said, you're in violation, was

25   that the end of the story for you?

1    A.   No.   He then explained what was on the thumb drive.   I

2    asked him what was on the thumb drive, and he told me what he

3    reported to be on there.   He said that he wanted to edit it.

4    So I assumed he was going to put it on a computer, but he

5    didn't ask me how to put it on a computer.   He didn't ask me

6    permission prior to possessing the thumb drive.   He's fully

7    aware of his condition not to possess, that he should have

8    told the person, don't give me the thumb drive.   Let me staff

9    with my officer first.

10   Q.   So you didn't even ask him why he was bringing it to you.

11   You just said, you're in violation.   End of story?

12   A.   Pretty much.

13   Q.   Okay.   And then he did volunteer he was bringing it to you

14   because it had his manuscript and he wanted to edit it.   Is

15   that right?

16   A.   Correct.

17   Q.   Now, you didn't search him and find it?

18   A.   No.

19   Q.   He brought it to you to ask you something about it.   Is

20   that correct?

21   A.   Correct.

22   Q.   And handed it to you?

23   A.   Correct.

24   Q.   And what you found on it was his manuscript that had been

25   written?

14

1    A.  Yes, sir.

2    Q.  Did you find anything else on it?

3    A.  No, sir.

4    Q.  Were you even interested in why he wanted you to have it

5    and what he wanted -- what he wanted to ask you about it?

6    Were you even interested in that?

7    A.  No, I'm not.  I'm interested in complying with his

8    conditions of supervision.

9    Q.  When you went to his house, you said, when you looked

10   through the window, he was sitting at a computer?

11   A.  Yes.

12   Q.  And you know that he had a computer that had all internet

13   access removed from it so he could use it as a word

14   processor?

15   A.  Correct.

16   Q.  And you had given him permission to use that computer as a

17   word processor?

18   A.  Well, it's -- I did.

19   Q.  You did?

20   A.  Well, he did it, and then he asked permission

21   afterwards.

22   Q.  And you gave him permission?

23   A.  Correct.

24   Q.  Okay.  And he produced information to you that the

25   computer had been altered where it had no internet access.  Is

15

1    that correct?

2    A.  Correct.

3    Q.  And the computer he was sitting at was, in fact, the

4    computer that had no internet access?

5    A.  Correct.

6    Q.  Okay.  The computer that was facing the other way was a

7    laptop.  Isn't that correct?

8    A.  Yes.

9    Q.  And the laptop was not facing towards him, right?

10   A.  No, it was not.

11   Q.  You did not see him touch it?

12   A.  No, I did not.

13   Q.  You did not see him access it?

14   A.  No, I did not.

15   Q.  You didn't see him controlling it in any way?

16   A.  No.  He did have access to it, but, no, I did not see

17   that.

18   Q.  Well, access is kind of a broad term.  When you access a

19   computer, you do something to it to make it run.  Is that what

20   accessing a computer is?

21   A.  I don't know the definition.  I'm sorry.

22   Q.  Okay.  He is prohibited from accessing a computer and you

23   don't know the definition?

24   A.  Well, accessing a computer in my mind would be he has

25   access to it.

16

1   Q.  Well, if there is a computer in a house that someone lives

2   in, is that a violation, if they have a wife that has a

3   computer?

4   A.  No, because we have password protect.  That's why we went

5   through the rules regarding her having password protect.  The

6   computer was in the home.  I was aware of the computer, and

7   his wife agreed to have password protect so he could not

8   access it.

9   Q.  Okay.  Did you talk to his wife about what was on the

10  computer and that she brought it into the room, and she had it

11  faced towards her and that the volume was playing, that he

12  could hear it?

13  A.  Yes.  They told me what they were doing it.  He was

14  listening to it.

15  Q.  Did you further inquire and learn that their son was

16  involved in an education reform project up in Minnesota and

17  that he had e-mailed to Mr. Smith's wife a podcast talking

18  about his education reform program and that she decided to

19  bring it in and allow Mr. Smith to listen to it but not touch

20  the computer, not access it or anything else?

21  A.  I didn't know the details regarding it was a program that

22  his son created.  I just knew it was something that was from

23  his son.  I don't know the details regarding the program, and

24  his wife did say that she opened the computer and accessed it

25  for him, played it for him.

17

1    Q.  And she's the one that accessed it.  As a matter of fact,

2    she said he didn't ask her to do it.  She did it?

3    A.  Correct.

4    Q.  Okay.

5              MR. KEARNEY:  Pass the witness.

6              MS. LARSON:  I have nothing further.

7              THE COURT:  Pardon?

8              MS. LARSON:  Nothing further.

9              THE COURT:  You may step down, ma'am.  Thank you.

10             MS. LARSON:  The government calls Lyles Arnold.

11             MR. KEARNEY:  Your Honor, Mr. Arnold is a witness as

12   to Roman Numeral I that you have not -- that you have not

13   allowed, and I don't know that he has any factual information

14   about II and III.

15             THE COURT:  Well, I'm not going to allow you to

16   determine what her witness is going to testify about.

17        Please raise your right hand and be sworn.

18        (Witness sworn by the Court)

19             THE COURT:  Please be seated.

20         LYLES ARNOLD, testified under oath as follows:

21                        **DIRECT EXAMINATION**

22   BY MS. LARSON:

23   Q.  Good morning, Mr. Arnold.  Will you please state your name

24   for the record?

25   A.  Lyles Arnold.

18

1   Q.  And how are you employed?

2   A.  I'm a licensed professional counselor and a licensed sex

3   offender treatment provider in private practice in Plano,

4   Texas.

5   Q.  How long have you been a sex offender treatment

6   provider?

7   A.  About 25 years.

8   Q.  Do you recognize Mr. Smith in the courtroom today?

9   A.  I do.

10  Q.  And how do you recognize him?

11  A.  He is sitting at the defense table.

12  Q.  Is he one of your clients?

13  A.  Pardon me?

14  Q.  Is he one of your clients?

15  A.  Yes, he is.

16  Q.  How long have you been working with him?

17  A.  He was evaluated in January of 2013, so just a little over

18  a year now.

19  Q.  Do you have any information about his possession of a

20  thumb drive?  Did you discuss it with him?

21  A.  I learned about it, actually, originally from Ms. Warner,

22  I believe simply stating that he had been in possession of a

23  thumb drive.  She wanted to know if I would look at the

24  contents of the thumb drive, and I did not want to do that.

25  Q.  Did you have any discussion with Mr. Smith about it?

19

1   A.  Prior to that?

2   Q.  At any time.

3   A.  Oh, at any time?

4   Q.  Yes.

5   A.  Simply that the event had transpired as described in

6   earlier testimony, that if he wasn't suppose to have portable

7   devices, then he wasn't suppose to have portable devices.

8   Q.  Did he tell you that he already knew that he wasn't

9   suppose to have it, or did you just re-admonish him that he

10  wasn't suppose to have it?

11  A.  I didn't do much with that incident.  It was something

12  that his officer had addressed, and I just kind of

13  re-admonished him and told him to do what he was suppose to do

14  to be in compliance with those stipulations of his

15  probation.

16  Q.  Now, what do you know with respect to the internet access

17  issue?

18  A.  The one referenced in the previous testimony?

19  Q.  Yes.

20  A.  I know that Mr. Smith is well aware that he is not to

21  access the internet.  I was looking at some of my notes prior

22  to coming in here, and we addressed internet issues with him

23  in the summer where he was going to seek permission to have

24  some internet access, perhaps.  When this episode occurred, it

25  was my understanding that it was a podcast, I think something

20

1    that his son -- his son was the speaker at a program and that

2    Ms. Warner just happened to show up for a home visit at that

3    time when Mr. Smith was listening to that podcast via the

4    internet.

5    Q.  Is he allowed to listen to podcasts on the internet?

6    A.  His conditions of probation stipulate no internet access

7    whatsoever.

8    Q.  And you can't give him permission to do that, can you?

9    A.  No, I cannot.

10   Q.  Are you familiar with the chaperone program?

11   A.  Yes.

12   Q.  And are you familiar with Mr. Smith's wife going through

13   that program?

14   A.  Yes.  I trained her in the chaperone program.

15   Q.  And as part of her training, was she instructed about

16   internet usage?

17   A.  One of the stipulations of the chaperone contract she

18   signed, as do all chaperones that I train, is that they will

19   be observing whether or not the individual on probation is

20   complying with the terms and conditions of his probation, and

21   they are to advise the treatment provider or the probation

22   officer if that person is in violation of the terms and

23   conditions of their probation.

24          MS. LARSON:  Your Honor, that's all I have on the

25   particular violations, but Mr. Arnold does have other

1    information pertaining to, perhaps, what the Court would like

2    to do about the violations, what the Court might want to

3    consider.

4            THE COURT:  I'll hear it.

5            MS. LARSON:  Okay.

6    BY MS. LARSON:

7    Q.  Mr. Arnold, going back to the failure of the lie detector

8    test?

9    A.  Yes.

10   Q.  What's the significance of that?

11   A.  The polygraph examination he failed in September was his

12   sexual history polygraph.  We have individuals go through

13   their entire sexual history so that we can understand the

14   scope of what their sexual behavior has been so that they can

15   understand how they ended up, you know, in a place in their

16   life where they elected to commit sexual offenses.  So when he

17   showed deception, it indicated, typically, in the sex history,

18   that you're deliberately lying about something or lying by

19   omission, withholding information.

20   Q.  With respect to -- were you familiar with the state fair

21   incident?

22   A.  Only after the fact.

23   Q.  And if an offender wants to go to something like that,

24   what steps does he have to take in order to do that?

25   A.  The procedure that's made very, very clear in my program

1    is that I don't have the authority to grant permission for an

2    offender to do anything.  So the typical protocol is that they

3    will present a safety plan to me in the group, and we will

4    either approve that plan or disapprove that plan.  If we

5    approve the plan, then the offender is clearly directed to

6    seek permission from the probation officer.  We're approving

7    it, but the officer is the one who grants the permission.

8    Q.  And how do you know that he knew about the safety plan and

9    that he should have prevented it to the group?

10   A.  We talk about safety plans continuously in our treatment

11   program, and with Mr. Smith, we actually addressed this issue

12   very specifically because he had had a trip planned to see his

13   son in Washington State, and part of that trip was to include

14   going to an outing to watch.  I believe, his 12-year-old

15   grandson played football.  I was concerned about him doing

16   that because in Texas we have a law that prohibits sex

17   offenders from going into anything designated as a child

18   safety zone until they have been on probation at least two

19   years.  Mr. Smith had not been on probation two years.  So

20   this issue of going into child safety zones was very

21   specifically addressed in his case during the summertime.  I

22   believe that was in the July-August time frame when he was

23   planning on a September trip to Washington.

24       It was brought up in testimony earlier suggesting that,

25   perhaps, I knew about the outing to the State Fair of Texas to

1  see the Lion King prior to him doing that.  That is absolutely

2  untrue.

3  Q.  Is it fair to say that at the point that Mr. Smith went to

4  the State Fair Lion King, that it's reasonable to conclude

5  that he understood that was a child safety zone?

6  A.  In my opinion, anyone who has been in my treatment program

7  for a month to six weeks is well versed in the concept of

8  child safety zones at least to the point where they would

9  raise a question before presuming to do something like that.

10  They may not know every single area in the metroplex that can

11  be designated as a child safety zone, but they know it's a

12  constant issue that they need to be mindful of.

13  Q.  Did you have any other issues with him regarding movies?

14  A.  One of the things we do in treatment is we, again, have

15  offenders generate safety plans for going to the movies

16  because movies are places where minors may be present.  There

17  are also inappropriate movies in terms of a man on probation

18  for a sexual offense.  So we talk about the development of

19  safety plans.

20     Mr. Smith did present a safety plan for going to the

21  movies, but in the process of discussing that safety plan, it

22  became apparent that he had already been going to movies prior

23  to receiving the permission.

24     We, ultimately, did approve a safety plan for he and his

25  wife to go to movies during daytime hours, Monday through

1    Thursday, at particular theaters like the Angelica, Magnolia.

2    I believe Studio Movie Grill is another one that we tend to

3    approve because there are restrictions on minors being at

4    Movie Grill after certain hours, but he's never been given

5    approved permission to attend the mainstream theaters like

6    Cinemark or Tinsel Town or any of those AMC multiplex

7    theaters.

8    Q.  Are you aware of any inappropriate movie that he saw other

9    than the Lion King show that was not approved?

10   A.  He saw a movie, and I don't know that the movie would have

11   been a violation of his probation because I don't know the

12   movie, don't know the content of it, but given Mr. Smith's

13   particular sexual issues, I questioned his judgment in going

14   to see a movie that was heavily themed with a homosexual plot.

15   I didn't understand that being a choice that he would have

16   made.

17   Q.  Other than what we've discussed, is there anything else

18   from the group, the group counseling that you've learned, that

19   causes you concern or that you think the judge should know?

20   A.   I think that Mr. Smith -- you know, the good part of

21   Mr. Smith is he comes to group.  He has homework.  He

22   participates in group.  He will give feedback.  He receives

23   feedback.  And, you know, along the way, as he has engaged in

24   things that have been in violation of treatment directives or

25   probation directives, I think that there has been -- I can't

1   sit here and say there has been no correction of anything.  I

2   think he's corrected some things, but I also find Mr. Smith on

3   a number of occasions, even as recently as December, you know,

4   being manipulative in the way that he communicates with the

5   group and the way that he communicates with me versus his

6   supervision officer.

7   Q.  And, generally speaking, how would you characterize the

8   violations that have been alleged?

9   A.  Are you talking specifically about the ones in the

10  petition?

11  Q.  And the concerns that you have?

12  A.  Well, I heard Ms. Larson state earlier that -- she

13  referenced boundaries.  Sexual offenses are boundary

14  violations.  This Court has put certain boundaries on

15  Mr. Smith that he needs to abide by, and I have found him to

16  be a person who has consistently pushed those boundaries.  So

17  that raises a concern.

18      He often has claimed not to understand the rules.  I don't

19  think that that's honest on his part.  I think Mr. Smith is a

20  very bright man.  He's a very accomplished man prior to being

21  incarcerated.  These rules aren't that complicated.  So I will

22  tell the Court the same thing I've told Mr. Smith on a number

23  of occasions.  I think he's manipulative in that way.

24          THE COURT:  Do you think that Ms. Smith is an

25  enabler?

26

1          THE WITNESS:  Yes.  And I would not consider

2    Ms. Smith to be an adequate chaperone at this point given the

3    violations of his probation that have occurred while she was

4    presumably the one supervising his activity.

5          MS. LARSON:  I have nothing further.

6          THE COURT:  Cross examination.

7                    **CROSS EXAMINATION**

8    Q.  Dr. Arnold --

9    A.  It's Mr. Arnold, for the record.

10   Q.  It's Mr.?  I'm sorry.

11       Mr. Arnold, Mr. Smith is an active member in your

12   treatment group?

13   A.  That's true.

14   Q.  He's in good standing?

15   A.  Yes.

16   Q.  You have not kicked him out?

17   A.  I have not kicked him out.

18   Q.  Do you expect him to be there next Monday if the judge

19   permits him -- next Tuesday?

20   A.  Tuesday.

21   Q.  If the judge permits him to stay out?

22   A.  Yes.

23          MR. KEARNEY:  Pass the witness, Your Honor.

24          MS. LARSON:  Nothing further.

25          THE COURT:  I have another question.

1    We're here today to decide whether his violations of his

2    terms of supervised release are sufficient to cause the Court

3    to send him back to prison, and part of that consideration is

4    not only whether he's violated and whether any of those

5    violations are worthy of being revoked, but, also, whether

6    the -- such incarceration should be enforced for more than

7    just retribution or punishment and should be accomplished

8    instead for deterrence and for safety of the community.

9    What is your position as to -- or do you have any opinion

10   as to whether an additional term of incarceration would

11   accomplish the purposes of deterrence and protection of the

12   public and, I guess, more particularly, under deterrence, the

13   efforts that you are making or that others are making to

14   secure Mr. Smith's compliance and his ability to avoid the

15   behavior that got him in trouble in the first place.

16          THE WITNESS:  Well, I don't make any kind of

17   sentencing recommendations.  I see myself, when I'm testifying

18   in these kinds of cases, as being a person to provide

19   information to the Court so that you can make a determination

20   as to what you would want to do.

21   I do think that there has been an accumulation of

22   violations of treatment and supervision directives that

23   warrant a sanction, and you can argue that this process in and

24   of itself has been sanctioned, you know, kind of a sanctioning

25   experience for Mr. Smith.  He's gone through expense, and I'm

28

1    sure he's had anxiety leading up to this proceeding.  So on

2    the spectrum of where we are today versus him returning to

3    prison, that's not for me to decide --

4              THE COURT:  I know that's my call.  My question to

5    you -- and you may not be able or willing to answer -- my

6    question to you is, will it accomplish something important to

7    this process of having him avoid future violations of the law,

8    future violations of his terms, and will it accomplish

9    something positive for the treatment that you are a part of?

10             THE WITNESS:  It's just very difficult to say, Your

11   Honor.

12             THE COURT:  Okay.

13             THE WITNESS:  Very difficult to say.  I've had

14   experiences that have fallen on both sides of that fence in

15   these kinds of proceedings.

16             THE COURT:  That's fine.  Thank you.

17        Any questions responsive to mine?

18             MR. KEARNEY:  No, Your Honor.

19             THE COURT:  You may step down, sir.  Thank you.

20        Is there more?

21             MS. LARSON:  That's all the evidence we have, Your

22   Honor.

23             THE COURT:  Anything from the defendant?

24             MR. KEARNEY:  No, Your Honor.

25        Your Honor, I do have one thing, and I don't know the

1    appropriate way to do this.  If the Court is considering a

2    sanction, we have some letters of what he's been doing --

3              THE COURT:  Okay.  Let's see them.

4              MR. KEARNEY:  -- since he's been out.  May I --

5              THE COURT:  Yes.  Hand them to Ms. Bush.

6         Well, I need some time anyway to think this over.  So

7    let's take about a ten minute recess and we'll reconvene.  I

8    may stay right here but go on about your business.

9         (Hearing recesses, 12:05-12:15 p.m.)

10             THE COURT:  I'm ready to reconvene.

11        Do you wish to speak on behalf of Mr. Smith before I make

12   my decision?

13             MR. KEARNEY:  Yes, Your Honor.

14             THE COURT:  Please keep it brief.

15        Mr. Smith, go ahead and step to the lectern.

16             MR. KEARNEY:  Your Honor, basically, as to the

17   allegation Number 2 that involves the thumb drive issue,

18   technically, it's a violation for him to possess it, but to

19   take it directly to his probation officer, hand it to her and

20   tell her what's on it and ask her advice about what to do with

21   it, tell her what he wanted to accomplish, certainly, if it's

22   a technical violation, it doesn't violate the purpose or

23   spirit of the rule.  The rule is, I think, designed so he

24   won't have access to sexually explicit material, not that he

25   takes something with none of that on it to a probation officer

30

1    and voluntarily takes it there for the purpose of asking her

2    permission.

3        As to Number 3, Your Honor, accessing the computer, I can

4    tell the Court I asked the probation officer if she had a

5    definition of what accessing the computer was, and she said,

6    no, she doesn't have a definition.  She can't give anybody a

7    definition.  It is certainly vague.  There is no evidence that

8    he accessed this computer as all.  As a matter of fact, she

9    talked to his wife, and his wife said that she brought it to

10   him.  It was a podcast from her son.  She started up the

11   computer, and it was facing towards her, not him, and it was

12   just playing a sound.  If that's access to a computer, Your

13   Honor, I guess if you hear somebody playing their I-Tunes on

14   their computer or their iPad or their iPod, you can be

15   accessing some kind of computer if you are listening to music.

16   So I don't think it's a violation of the spirit of the rule.

17       Also, as to his lifetime prohibition of accessing the

18   computer, I think that it runs afoul of United States versus

19   Miller, 665 F.3d 114, as being an unreasonable restriction on

20   his ability for a lifetime to access a computer, and under

21   that theory, I don't think the Court should use that as the

22   basis of any kind of revocation or supervised release.

23       As to the other things that were mentioned by Mr. Arnold

24   about going to the movies or getting permission to go to the

25   movies, there is nothing in his rules of probation that say he

1    can't go to a movie.  That's not a condition of his supervised

2    release.

3         What they know about the movies -- what they know about

4    the movies is what he told them.  He came to group.  He asked

5    them about movies.  He volunteered he had been going to

6    movies.  He brought the issue up according to Lyles Arnold,

7    and he brought the issue before the group to discuss it.  He's

8    not suppose to go where children congregate.  That's not

9    alleged in this petition, but when you go to a movie and what

10   type of movie you go to, it could be a place where children

11   don't congregate at all at that period of time.  He can go to

12   Wal-Mart, and children are certainly at Wal-Mart and that's

13   permitted.  It's such a nebulous area, and I think the key

14   point is that Mr. Smith brought the issue up to Mr. Arnold.

15             THE COURT:  Thank you.

16             MR. KEARNEY:  Thank you.

17             THE COURT:  Mr. Smith, do you wish to speak on your

18   own behalf?

19             DEFENDANT SMITH:  Yes, sir.

20        I had hoped never to be back in your court, and I'm sorry

21   that I caused this hearing.  I would have expected that

22   probation would be easy for me, frankly, but I had followed

23   some of the rules that have been difficult for me to

24   understand, and I'm a pretty educated person.

25        Your Honor, nobody is more committed to me not

32

1    re-offending than I am.  Before going to prison, you allowed

2    me to spend four-and-a-half months in residential treatment at

3    Santos Center for sex addiction.  That saved my life.  Before

4    I went to prison, I attended 200 meetings of Sex Addicts

5    Anonymous, Sexaholics Anonymous, because I want to change my

6    life and because I found that that program works for me.

7        In prison, along with several other inmates, we organized

8    the only program in the prison for sex offenders.  It began as

9    a Bible study program.  We did Celebrate Recovery, a 12-step

10   program, and for the last several years I was there, we had a

11   Sex Addicts Anonymous group in the prison.  To my knowledge,

12   that's the only Sex Addicts Anonymous group in the federal

13   prison.  The chaplain was very helpful with us in that

14   regard.

15       At my sentencing, I promised you that I would dedicate the

16   rest of my life to helping other people and I have, and I

17   tried to do that in prison and I have tried to do that

18   since.

19       I have used my own experience, strength and hope to help

20   others suffering from sex addiction to learn from my

21   experiences.  I attend four to five meetings of Sex Addicts

22   Anonymous a week in Denton.  I have an excellent sponsor.

23   He's here today.  I sponsor currently four men meeting with

24   them on a weekly basis, talking to them on the phone on an

25   almost daily basis attending meetings with them, all for the

1    purposes of helping them to not end up where I ended up.

2            THE COURT:  Are you are working?

3            DEFENDANT SMITH:  No, sir.

4            THE COURT:  You're retired?

5            DEFENDANT SMITH:  I am.  I'm 70 years old.

6            THE COURT:  Okay.

7            DEFENDANT SMITH:  I've been elected to serve as the

8    leader of one of the groups in Denton.  I have rebuilt my

9    relationships with my wife, Judy, and my children.  My family

10   relationships have never been better.  My wife and children

11   are here as are many of the people in the sex addiction

12   programs that I participate in.

13       I've been denied the opportunity to contact my

14   grandchildren for most of my probation.  Some of my

15   grandchildren I have not met or seen since I got out of prison

16   14 months ago.  I regret that very much, and I recognize that

17   my behavior plays a role in that.

18       If you will allow me to continue on supervised release,

19   Your Honor, I will do everything I can to comply with every

20   one of the conditions of my release.  Thank you very much for

21   your time.

22           THE COURT:  All right, sir.  Thank you.

23           MR. KEARNEY:  Your Honor, I wanted to mention, you

24   have the letter from Douglas Smith, his son.

25           THE COURT:  I do.

1          MR. KEARNEY:  Who has traveled here from the Seattle

2     area.  His other two sons are here.  The one from Minnesota is

3     here and, also, the one that lives locally here, Dan and

4     Chris, and they have asked me to tell you that they would say

5     the same things that Davis said in his letter.  They have read

6     it and they agreed with all of it.  Thank you, Your Honor.

7          THE COURT:  Thank you.  I read it.

8          MS. LARSON:  Your Honor, can I just clear up a couple

9     of things?

10          THE COURT:  Yes.

11          MS. LARSON:  I just wanted to make a couple of

12     points.  One, we're not alleging it was a condition of

13     probation for Mr. Smith to get the plans to go here or there

14     and to go to movies, but it's clearly one of the things he has

15     to do in connection with his therapy.  So that's really a

16     problem for him to be going places when that's something they

17     discuss in group before they even present it to the probation

18     officer.

19        The other thing is the fact that he admits that he saw the

20     movie or went here and there, he's got to do that because he's

21     subject to polygraph examinations, and he's going to be asked

22     those questions.  So I just didn't want the Court to have a

23     rosy picture of Mr. Smith when the conditions that he's

24     subject to, which he full well understands, require that he

25     has to tell on himself because --

1          THE COURT:  Well, I agree with you, but he has

2     certain conditions that he has to comply with, and we'll hold

3     him to those, but the additional conditions that are placed on

4     him by his therapist are not enforceable by the Court.  So if

5     his therapist has additional conditions or things that he

6     requests that he do, that's between him and his therapist, and

7     I'm in no position to revoke him for not doing exactly what

8     his therapist tells him to do.  And I'm concerned, just as you

9     are, that we get full compliance with the conditions, but

10    that's the limit of my power.

11        I'm going to deny the motion to revoke.  However, I'm

12    going to schedule a hearing for an update on the compliance

13    with the conditions of supervised release in 90 days.

14    Depending on what we hear there, I'll either hold another

15    hearing in 90 days or have something to say at that point, or

16    if there have been additional problems, I could revoke.  All

17    present allegations are still in existence as to Roman

18    Numerals II and III in the petition for offender under

19    supervision, and we'll go from there.

20        Any questions, Ms. Larson?

21          MS. LARSON:  No, Your Honor.

22          THE COURT:  Is that clear?

23          MR. KEARNEY:  No, Your Honor.  Thank you, Your

24    Honor.

25          THE COURT:  I'll send out an order for a follow-up

36

1   hearing in 90 days.

2        Mr. Smith, let's don't keep having problems.  I gave you

3   96 months instead of 210, but a lot of people have invested a

4   great deal into you.  So even though it's annoying and

5   worrisome to have to tow the mark exactly, apparently, that's

6   what you're going to have to do.  So I encourage you to do

7   that, and maybe there will be some more latitude later.

8             DEFENDANT SMITH:  Thank you, sir.

9             THE COURT:  Good luck to you.  We'll see you in 90

10  days.

11       (End of proceedings, 12:25 p.m.)

12                             -oOo-

13

14

15                        **I N D E X**

16  Witnesses:          Direct      Cross      Redirect      Recross

17  Linda Warner           5           11

18  Lyles Arnold          17           26

19

20                             -oOo-

21

22

23

24

25

37

1

### CERTIFICATE

2      I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter, and
3 that the transcript was prepared by me and under my
supervision.

4
s/  Ana P. Warren                          April 1, 2019
5 Ana P. Warren, CSR #2302                       Date
U.S. District Court Reporter
6

7                              -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25